# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 59145-6-II |
| Respondent, | |
| v. | |
| WILLIAM LEE RICKMAN, | UNPUBLISHED OPINION |
| Appellant. | |

GLASGOW, J.—After Gloria Choi ended a romantic relationship with William Rickman, Rickman began stalking and harassing Choi. Rickman took Choi's truck and would not return it, sent her threatening messages, and vandalized the vehicles of Choi and Choi's male friend. Choi called the police to report Rickman's behavior several times. One evening while Choi was driving home from work, she pulled over, called 911, and told the dispatcher that she thought her boyfriend was following her. The truck pursuing her pulled over as well and Choi said, "It is him," while pleading with the dispatcher to send someone. Clerk's Papers (CP) at 584 (Unchallenged Finding of Fact (FF) 3). The assailant then shot Choi multiple times, killing her.

Police responding to the scene identified Rickman as a suspect because of his known history of harassing Choi, and surveillance footage strengthened their suspicions. Police arrested Rickman a few days later, and the State charged him with aggravated murder. While in jail, correctional staff received a tip that someone was attempting to escape and found that Rickman had removed parts of his cell window and hidden them under his mattress.

Police obtained a number of search warrants, including one for the contents of Rickman's cell phone. The affidavits in the applications for these search warrants included a transcription of Choi's 911 call that omitted "I think" before "my boyfriend is following me." Investigating officers improperly extracted location data from Rickman's smartphone, apparently believing that the warrant authorized them to do so.

Before and during trial, Rickman moved to suppress his location data. First he moved for a *Franks*[1] hearing, arguing that the omission of, "I think" from the 911 transcript was a material misrepresentation and that the warrant was therefore invalid. The trial court denied the motion. Later, Rickman moved to suppress the location data because the warrant for his cell phone had not authorized its extraction. In response, the State applied for and received a new warrant for the location data. The trial court held that because of the new warrant, Rickman's cell phone location data was admissible under the independent source doctrine. Rickman also moved to suppress evidence of his escape attempt. The trial court denied the motion.

Rickman appeals the trial court's decisions denying a *Franks* hearing, admitting Rickman's location data under the independent source doctrine, and admitting evidence of Rickman's escape attempt. We affirm.

FACTS

I. BACKGROUND

William Rickman met Gloria Choi while he was staying at a hotel that Choi managed for her family. The two began dating and moved into an apartment together shortly afterward, in July

---

[1] *Franks v. Delaware*, 438 U.S. 154, 98 S. Ct. 2674, 57 L. Ed. 2d 667 (1978).

2021. At some point, Choi changed jobs and began working at a different hotel in Lakewood. In November 2021, Choi broke up with Rickman and moved out of their shared apartment.

A.     Theft of Choi's Ford F-150 Truck

On November 26, 2021, Choi called the police and reported that Rickman had stolen her truck, a blue Ford F-150. Choi and Rickman communicated over text for the next several days. Choi sought to get the truck back from Rickman, who repeatedly asked Choi to call him and to try to fix the relationship with him. Choi repeatedly reiterated that the relationship was over and could not be repaired. She told Rickman that all she wanted was to get her truck back so she could cancel the police report.

Police located Rickman and the truck in Onalaska at the home of Rickman's friend Tom Beeson and arrested Rickman. An officer questioned Rickman after the arrest, and Rickman admitted that he had placed a tracking device on the keys to Choi's truck because "she loses her keys all the time." Ex. 292A. He denied placing a tracking device in the truck itself. In fact, there was a tracking device on Choi's truck. On December 1, 2021, Thurston County Superior Court issued a no-contact order prohibiting Rickman from communicating with Choi.

B.     Violations of the No-Contact Order and Escalating Behavior

Despite the no-contact order, Rickman asked his friend, Angel Manrriquez, to contact Choi on his behalf multiple times. Choi also encountered Rickman at a mall sometime that December, and Choi recorded the encounter and reported it to the police as a violation of the no-contact order.

Sometime in early December after recovering her truck, Choi and a coworker searched her truck for a tracking device but did not find one. At a gathering on Christmas, Rickman told an

acquaintance, Joshua Krohn, that if Rickman found out Choi was with "some other guy, that it was all over." 9 Verbatim Rep. of Proc. (VRP) at 1170.

On December 30, Choi met up with a friend who also worked in the hotel industry, Jacob Blue, to discuss end-of-year budgeting. Blue drove to the parking lot of the hotel where Choi worked, and Choi drove the two of them in her truck to a nearby café to work. While there, Choi received two phone calls and became nervous. After about an hour, Choi drove Blue back to the hotel parking lot to get his wallet and then to a nearby restaurant. While at the restaurant, Choi noticed a car parked across the street with its headlights on, pointed at her and Blue. She told Blue that she believed the person in the car was watching them. At 5:49 p.m., Rickman sent Choi an email that said, "You left me for another guy wow." Ex. 436.

When they returned to Choi's truck after about an hour, they discovered that the doors were unlocked, their bags and laptops had been stolen, and one of the truck's tires had been punctured. Choi called her father, who drove them back to Blue's car at the hotel. Once there, they discovered that someone had also punctured two of the tires on Blue's car. Blue and Choi called the police.

Blue and Choi reviewed security footage from the hotel Choi managed, which showed Choi's truck leaving the parking lot after stopping to get Blue's wallet, and then a dark hatchback car leaving a few seconds afterward. Later footage showed a person approaching Blue's car on foot and stabbing the tires. When the police arrived, Blue and Choi told them what they had discovered.

The following day, December 31, Rickman rented a silver Chevy Colorado pickup truck. A few hours later, he checked into a motel near the hotel where Choi worked.

That afternoon, Choi drove her mother's car to pick up Blue and bring spare tires to his car. She told him she believed her truck was being tracked. On the way, Choi began receiving voice messages from Rickman. When Choi and Blue arrived at the hotel, they discovered that the other two tires of Blue's vehicle had been punctured. Blue and Choi again reviewed the hotel's security footage, which showed a person exiting a silver pickup truck and ducking behind Blue's car. They again reported the incident to law enforcement.

Rickman also called Choi's ex-boyfriend, Jason Angell, that day, telling him that Rickman and Choi had broken up and that Choi had a new boyfriend. Rickman seemed upset and, at the end of the call, told Angell that Rickman "would take care of it" and would "be on the news." 10 VRP at 1311. That evening, Rickman emailed Choi a link to a song where the male singer accuses an ex-girlfriend of "[lying] to [his] face" and being "toxic." Ex. 437.

On January 1, 2022, Choi got a new phone with a new number. The same day, Rickman drafted a text to Choi's old number:

> Now I know when you kept telling me your not a [wh**e] like Jason was saying you really are a [wh**e]. Easy [p***y] to whoever gives you a look. You a nasty [b***h] and good luck on what's coming for you and that child molester drug needle using junkie you think is a good guy. See you soon. [B***h]. Happy 2022 [c**t] good luck.

Ex. 405.

Between December 31 and January 2, Rickman purchased and downloaded private investigative reports on Choi, Blue, and a third person.

C.      Choi's Murder

On January 2, Rickman left his motel room at around 5:45 p.m. and drove away in the rented Chevy truck. Rickman turned off his phone while near Choi's hotel at 6:00 p.m. and for the

next hour or so alternated between driving around the hotel and parking in nearby parking lots. At 7:20 p.m., Choi left the hotel in her father's truck. It appears Rickman began following Choi in his rented Chevy.

Three minutes later, Choi called 911. Choi made the following statements on the 911 call, which was recorded:

> I'm on . . . I don't know where I am, but I think my boyfriend's following me and he just hit my car . . . I'm on . . .
>
> No, he stopped in front of me cause I stopped and now he's stopped in front me too, but I'm scared to get out of my car. . .
>
> It is him, (unintelligible) He's got a gun! Please come!

CP at 584 (Unchallenged Finding of Fact (FF) 3). After this exchange, Choi began to scream. The audio recording captured several popping sounds, then a period of silence, followed by a second round of popping sounds.

A man living in an apartment complex across the street, Terry Estvold, heard gunshots. When he looked out his window, he saw two pickup trucks parked across the street and a person walking towards the front of one of the trucks. A few seconds later he saw one of the trucks push the other truck from behind into a telephone pole. Estvold then saw the truck that had pushed the other drive down the road, then pull a U-turn back toward the other truck. Estvold heard several gunshots as he moved to another room to get a better view. Estvold called 911.

D.     Aftermath and Arrest of Rickman

When police responded about 10 minutes later, they found a truck on the shoulder of the road with the front end pressed against a utility pole. The left front of the truck was damaged and the driver's-side window had been smashed. There were several bullet holes in the driver's-side

window and driver's door, and there were shell casings on the road around the truck. Police found Choi slumped over inside the car. Choi was unconscious with a faint pulse and had multiple gunshot wounds in her arms and abdomen. Emergency medics attempted to save her life, but Choi lost a pulse on the scene and died. An autopsy confirmed that her death was a homicide caused by multiple gunshot wounds.

One of the responding officers recognized Choi because he had responded to her previous 911 call after Blue's tires had been slashed several days before. Police therefore immediately identified Rickman as a potential suspect. Police also collected surveillance footage from businesses around the area of the murder and Choi's hotel, which further strengthened their belief that Rickman was a suspect.

Meanwhile, Rickman had returned to the motel where he was staying. While there, at 7:34 p.m., he turned his cell phone back on. Rickman turned on a police scanner app, wiped down the rented Chevy, and made several phone calls.

At 7:54 p.m., a Mercedes with three people in it pulled up to the motel and picked up Rickman. One passenger from the Mercedes got into Rickman's rented Chevy and drove it away. The Mercedes drove Rickman to Manrriquez's house. While in the Mercedes, Rickman told the other two people in the car that he had killed his girlfriend because she had cheated on him and because he might go to prison because of her. One of those people was Rickman's friend, Jeremy Dyches. Once Rickman arrived at Manrriquez's house, Manrriquez drove Rickman to Beeson's house in Onalaska where Rickman had left his own car.

Two days later, on January 4, Angell contacted law enforcement and told them about the call where Rickman told him "he would be on the news." 10 VRP at 1311.

On January 5, police sought and obtained a warrant to trap and trace Rickman's phone in order to locate him. The declaration attached to law enforcement's application for the warrant included the following transcription of Choi's 911 call:

> My boyfriend is following me and he just hit my car . . . I'm on 112[th] St in front of the high school and the tennis place . . . He stopped in front of me because I stopped and now he's stopped in front of me too but I'm scared to get out of my car . . . I'm right in front of the Cloverdale Court. It's a one-way street. I'm in a Ford Ranger, gray one . . . ([u]nintelligible) . . . He's got a gun! Please stop!

CP at 237 (emphasis omitted) (boldface omitted). This transcription omitted "I think" before "[m]y boyfriend is following me." *Compare* CP at 237, *with* CP at 584 (Unchallenged FF 3). This transcription also omitted "It is him." *Id.*

On January 6, law enforcement located Rickman's phone in northern California. When police in California located Rickman, Rickman fled in his car and then hid in a creek for several hours while police searched for him. After police left the area, Rickman sought refuge at a nearby farmhouse. The owners of the farmhouse called 911 without alerting Rickman, and law enforcement arrived and arrested Rickman.

At some point in their investigation, police interviewed Jeremy Dyches, who admitted to them that Rickman had confessed that he killed his girlfriend on the night of the murder.

The State charged Rickman with aggravated first-degree murder for killing Choi. The State alleged that Rickman was armed with a firearm during the commission of the offense and included two aggravating factors: that Rickman shot a firearm from or near a vehicle when he committed the murder; and that Rickman knowingly violated a no-contact order when he committed the murder.

E.        Search Warrants and Phone Location Data

Between January 3 and January 14, 2022, detectives sought and obtained several search warrants. Many of the warrant applications, such as those for Choi's smartphone, Rickman's rented Chevy truck, call detail records from Rickman's cell phone carrier, the rental agreement between Rickman and the car rental company and video surveillance footage from the rental company, and Rickman's bank account all included the same transcription of Choi's 911 call that police had used in the trap and trace warrant application. The call detail records police obtained from Rickman's phone carrier included some text messages Rickman had sent. Based on these texts, police were able to determine the motel where Rickman was staying at the time of the murder and obtain surveillance footage and Rickman's check-in paperwork.

On January 25, 2023, Detective Karen Latimer applied for a warrant to search the contents of Rickman's smartphone. The warrant application sought a contact list; call, text, and FaceTime logs; notes; photo files; and emails. The application did not seek location information stored on the phone. Latimer's accompanying declaration included the same transcription of Choi's 911 call from the trap and trace warrant application that omitted "I think" before "[m]y boyfriend" and did not include Choi saying "It is him." CP at 317; CP at 584 (Unchallenged FF 3).

The declaration also included significant additional information implicating Rickman in the murder: that Choi had a valid protection order against Rickman; that Rickman "had aggressively violated the protection order via third party, direct email, and phone"; that Rickman had withheld Choi's vehicle in an apparent "attempt to keep [her] from ending the relationship"; that Choi had identified Rickman on surveillance footage as the person who had likely slashed Blue's tires; that Choi "had not dated anyone after dating [Rickman]"; that Rickman had told

9

Angell that Choi had a new boyfriend and Rickman was going to "'take care of it'" and would "'be on the news'"; that surveillance footage from the day Choi was murdered showed Rickman following Choi and stopping near her on the shoulder of the road at the same time that Choi called 911; that surveillance footage then showed the car leaving and returning shortly afterward to pull beside Choi's car, coinciding with the second round of popping noises on the 911 call; that surveillance footage after the murder showed Rickman wiping down the rented Chevy; and that after Rickman was picked up by two friends, he told them that "he just killed his girlfriend." CP at 318-24. The trial court issued the warrant, which did not include authorization to search for location information because that authorization was not requested.

Police extracted location data from Rickman's cell phone, even though the warrant did not cover location data. The location data corroborated that on December 30, 2021, Rickman was at the café where Choi and Blue were discussing business, then at Choi's hotel, then at the restaurant where Choi and Blue had dinner. On December 31, the location data placed Rickman at the car rental company, and then captured him driving back and forth between Choi's hotel, Choi's home, Rickman's motel, and several other locations, including Manrriquez's apartment complex and an address associated with Blue that was listed on the private investigative report Rickman purchased. On January 2, the day of the murder, the location data showed Rickman driving toward Choi's home, then to several churches, including a Korean church. The location data showed Rickman driving back and forth between his motel and Choi's hotel several times starting at around 5:40 p.m. Location data placed Rickman at Choi's hotel at 5:57 p.m., and then there was a gap in the data between 5:57 p.m. and 7:30 p.m., the time frame when the murder occurred. When the data resumed, Rickman was at his motel. The data then captured Rickman traveling to Manrriquez's

10

apartment and then Beeson's house in Onalaska. Location data from a few days later showed Rickman driving down to California.

F.     Alleged Escape Attempt

Rickman was jailed in Pierce County. On May 17, 2022, a fellow inmate notified correctional officers that Rickman was attempting to escape his cell. When correctional officers entered Rickman's cell, Rickman said, "'[O]h, [s**t]'" and "'it's under my bed.'" 2 VRP at 130. Officers looked under Rickman's mattress and found a metal sheet and two metal brackets that were supposed to help hold the cell window in place. There was a small hole in the window wide enough to fit a couple of fingers. Several screws were loose in the window, and the window's caulking had been removed and replaced with paper and plastic. The window itself was about two feet by four feet and had a concrete barrier dividing it in two.

II. PRETRIAL PROCEEDINGS

A.     Motion for *Franks* Hearing

About a week before trial, Rickman filed a motion requesting a *Franks* hearing. Rickman alleged that the police had made material misrepresentations in their warrant application affidavits when they transcribed Choi's 911 call omitting her statement, "I think" before "[m]y boyfriend is following me." He argued that as a result, the trial court should "suppress all of the fruit flowing from every warrant in this case" that relied on the incomplete 911 call transcript. CP at 205, 317.

In its findings and conclusions, the trial court recited the transcription of the 911 call that was presented to support the warrant applications. The trial court listened to the 911 recording and found that "the caller does identify the person that hit her car and was standing at her window with a gun just prior to her being shot, as her boyfriend." CP at 584 (Challenged FF 2). The trial court

then found that in the recording, Choi said, "It is him" after initially telling the dispatcher that she thought her boyfriend was following her. CP at 584 (Unchallenged FF 3). The trial court further reasoned that even if there were an error or misrepresentation, the affidavit included sufficient evidence outside of the 911 call to justify a probable cause finding. The trial court therefore declined to order a *Franks* hearing.

B.      Motions to Suppress Escape Attempt

Rickman also moved to exclude any evidence of his alleged attempt to escape from Pierce County Jail based on relevance and the danger of prejudice outweighing the probative value under ER 401, ER 402, and ER 403. The State moved to admit the same evidence under ER 404(b). There were no charges associated with the attempted escape. At the hearing on this motion, Pierce County Jail corrections sergeant George Wasson testified that when he entered Rickman's cell after another inmate tipped off the staff about an escape attempt, Rickman said, "'[O]h, [s**t]'" and "'it's under my bed.'" 2 VRP at 130. Wasson further testified that there were brackets and a screen from the window hidden under Rickman's mattress, and that the window was missing several screws.

The trial court found by a preponderance of the evidence that Rickman attempted to escape from his jail cell. The trial court explained that the State was seeking to admit evidence of the escape attempt for the purpose of showing consciousness of guilt. The trial court determined that Rickman's tampering with the window "create[d] a reasonable and substantive inference [of] . . . consciousness of guilt or deliberate effort to evade prosecution." CP at 538 (Challenged Conclusion of Law (CL) 6). Finally, the trial court found that the probative value of this evidence outweighed its prejudicial effect when used to show Rickman's consciousness of guilt.

Rickman later moved again to exclude evidence of the alleged escape attempt, arguing that Rickman's tampering with the window could have been "vandalism" or "any number of things" other than an escape attempt. 5 VRP at 514. The trial court referred back to its prior ruling and again found by a preponderance of the evidence that the escape attempt occurred. The court again held that the evidence was being "admitted for showing a consciousness of guilt, and . . . there[] [was] a connection between fleeing and attempted escapes as well to show that consciousness of guilt." 5 VRP at 518. And it determined that the danger of unfair prejudice from admitting the evidence did not substantially outweigh its probative value.

### III. TRIAL

The parties began presenting evidence to the jury on November 21, 2023.

A.     Mid-trial Motion to Suppress Location Data

Partway through trial, Rickman apparently realized the warrant allowing the search of his phone did not authorize location data extraction. The State promptly sought and obtained a second search warrant for Rickman's location data.

The State's new search warrant application included several new paragraphs of information and added location data, application usage, and "[d]etails of physical device manipulation" to the list of evidence it sought. CP at 424 (boldface omitted). It was otherwise identical to the original search warrant application for Rickman's phone.

In the new paragraphs, Latimer stated that she had "inadvertently failed to list several of the items intended to be searched for in the phone data." CP at 422 (emphasis omitted). She stated that "the majority of Americans . . . keep [their] phones within their reach at all times" and that cell phones are used for many things, including "information pertaining to the physical location of

13

the device over time." CP at 422-23 (emphasis omitted). She added, "Data stored in a cellular phone can reveal a person's location at specific dates and times. . . . As such, a person's use of the phone can reveal where a person has been at dates and times relevant to the crimes under investigation." CP at 423 (emphasis omitted). Latimer stated that "Choi believed . . . Rickman was 'tracking her' using . . . his cellular phone" and that in the lead-up to Choi's murder, "Rickman managed to find and follow Choi on multiple occasions despite them living in different cities." *Id.* (emphasis omitted). And she stated that police knew based on "previously received and documented Call Detail Records . . . and from activities noted during the . . . trap and trace that . . . Rickman manipulated his phone by placing it in  . . . '[a]irplane mode' or turned it on and off, likely in attempts to be untraceable via location data." *Id.* (emphasis omitted).

Rickman filed a motion to suppress the location data police had taken from his phone, arguing that the original search warrant had not authorized it. The State responded that the motion was untimely because Rickman did not file it until the middle of trial despite having the opportunity to do so earlier. It also claimed that Detective Latimer had "inten[ded] from the very beginning to get GPS information" from Rickman's phone and her failure to include it in the warrant application was a mistake. 9 VRP at 1277. The State told the court that Detective Latimer had "look[ed] at the GPS information because she inadvertently believed that the warrant authorized that as well." 9 VRP at 1274.

The trial court acknowledged that the motion was untimely but heard it anyway. The trial court agreed that law enforcement had not been authorized to extract the location data from Rickman's phone based on the first warrant. But, relying on *State v. Betancourth*,[2] the trial court

---

[2] 190 Wn.2d 357, 413 P.3d 566 (2018).

decided that because the second warrant application did not include any new information that arose from the improperly extracted location data, the location data was admissible under the independent source doctrine. The trial court stated that although it was hearing the untimely motion, "[t]he timing of the motion impact[ed]" its decision because if Rickman had brought it earlier, the issue "would have been ironed out and addressed before trial." 9 VRP at 1285.

B.      Evidence Presented at Trial

The jury heard extensive testimony from law enforcement officers; friends and acquaintances of Choi and Rickman, including Blue, Angell, Manrriquez, Krohn, and Dyches; and eyewitnesses such as Estvold. Their testimony was consistent with the facts described above.

Wasson also appeared at trial, where he testified consistent with all of the facts listed above about Rickman's alleged escape attempt. In contrast with the less detailed accounting he had given to the trial court at the CrR 3.5 hearing, Wasson additionally testified that a person had once successfully knocked a concrete bar out of a jail window, and that a person might tamper with a jail window so that they could go "fishing" for contraband with the help of an accomplice. 11 VRP 1599.

The jury viewed extensive, timestamped surveillance footage showing Rickman's movements on the days leading up to the murder and the day of the murder. For instance, the jury saw footage from Choi's hotel on the last days of 2021, showing the person Choi and Blue believed to be Rickman flattening Blue's tires and following Choi and Blue out of the parking lot. Other surveillance footage showed Rickman checking into the motel near Choi's workplace on December 31. Footage from January 2, the day of the murder, appears to show Rickman leaving his motel, driving around the area of Choi's hotel, stopping next to her on the shoulder of the road,

and leaving briefly before making a U-turn and driving back to the location of Choi's vehicle. Additional footage from that evening showed Rickman returning to his motel, cleaning out the rented Chevy, talking on the phone, and eventually getting into his friend's Mercedes after it pulled into the parking lot. All of this footage was gathered before law enforcement collected location data from Rickman's phone.

The jury listened to Choi's 911 call and the portion of Dyches' police interview where Dyches told the police that Rickman confessed to killing his girlfriend. The jury also saw the rental agreement between Rickman and the company that rented him the silver Chevy Colorado from December 31. The trial court admitted a video that summarized the location coordinates of Rickman's phone in the days leading up to and following the murder and interposed them with relevant surveillance footage. The trial court also admitted still images from Rickman's phone showing Choi's vehicle and keys being tracked. Finally, the jury viewed the communications between Rickman and Choi described above, including their text messages where Choi sought to get her car back and convince Rickman that their relationship was over; the emails Rickman sent Choi accusing her of having a new boyfriend and sending her song lyrics; and the text Rickman drafted to Choi the day before the murder calling her misogynistic slurs and telling her he would "[s]ee [her] soon." Ex. 405.

The jury found Rickman guilty of aggravated first-degree murder. It also found by special verdict that Rickman was armed with a firearm at the time of the offense and that both aggravating circumstances—that Rickman fired a gun from a motor vehicle or the immediate area of a motor vehicle and that Rickman violated a no-contact order—were present. The trial court sentenced Rickman to life in prison without the possibility of parole. Rickman timely appeals his conviction.

ANALYSIS

## I. DENIAL OF *FRANKS* MOTION

First, Rickman contends that the trial court erred when it denied him a *Franks* hearing to determine whether the warrant authorizing law enforcement to search Rickman's smartphone was improperly based on material misrepresentations. He reasons that the warrant application included a modified transcription of Choi's 911 call that read, "'My boyfriend is following me'" rather than "'I think my boyfriend is following me'" without clear indications that the quotation was modified. Appellant's Opening Br. at 10-11 (quoting record) (emphasis omitted). We disagree and hold that the trial court properly concluded that Rickman failed to make a substantial preliminary showing that the omission of "I think" was material or anything more than negligent.

### A.    *Franks* Hearing Requirements

Under both the Fourth Amendment to the United States Constitution and article I, section 7 of the Washington Constitution, "factual inaccuracies or omissions in a warrant affidavit may invalidate the warrant if the defendant establishes that they are (a) material and (b) made [intentionally or] in reckless disregard for the truth." *State v. Chenoweth*, 160 Wn.2d 454, 462, 479, 158 P.3d 595 (2007) (citing *Franks*, 438 U.S. at 155-56). A defendant is entitled to a *Franks* hearing if they can make a substantial preliminary showing on both prongs. *State v. Ollivier*, 178 Wn.2d 813, 847, 312 P.3d 1 (2013); *see also State v. Garrison*, 118 Wn.2d 870, 872, 827 P.2d 1388 (1992).

We review a trial court's decision to hold or deny a *Franks* hearing for abuse of discretion. *State v. Wolken*, 103 Wn.2d 823, 829-30, 700 P.2d 319 (1985). "A trial court abuses its discretion when its decision 'is manifestly unreasonable or based upon untenable grounds or reasons.'" *State*

*v. Dobbs*, 180 Wn.2d 1, 10, 320 P.3d 705 (2014) (quoting *State v. Powell*, 126 Wn.2d 244, 258, 893 P.2d 615 (1995)). "We review [challenged] findings of fact for substantial evidence." *Blackburn v. State*, 186 Wn.2d 250, 256, 375 P.3d 1076 (2016).

B.    Analysis

Rickman fails to show that the officer's omission of the words "I think" from the 911 transcript was material. Rickman challenges the trial court's finding of fact that "upon reviewing the 911 call, the caller does identify the person that hit her car and was standing at her window with a gun just prior to her being shot, as her boyfriend." CP at 584 (Challenged FF 2). But that finding was supported by the trial court's unchallenged finding—which we accept as a verity— that Choi later told the dispatcher, "It is him." CP at 584 (Unchallenged FF 3); *see Robel v. Roundup Corp.*, 148 Wn.2d 35, 42, 59 P.3d 611 (2002). We also find support for the challenged finding in the 911 recording itself, which reflects that Choi said, "It is him" before she was shot. Ex. 234, at 50 sec. Therefore, there was substantial evidence to support the court's finding that Choi identified her assailant as her boyfriend. Accordingly, there was no *material* omission because the version of the transcript included in the original warrant application, which excluded "I think" and presented Choi's quote as if she knew it was her "boyfriend" following her, conveyed essentially the same information as the actual call.

Additionally, Rickman fails to show that the omission of "I think" was anything more than negligent. Rickman asserts that "changing capitalization and leaving out words that qualify a claim stand on their own as an indisputable offer of proof of recklessness or worse," pointing favorably to *Garrison*. Opening Br. of Appellant at 16. But that case does not support Rickman's position, and instead supports the trial court's decision. In *Garrison*, the Washington Supreme Court held

that the fact that an affiant had omitted a material series of questions and answers from an interview transcript did not necessarily prove that the omission was reckless, emphasizing that "'intentionality and materiality'" are distinct elements in the *Franks* inquiry. *Garrison*, 118 Wn.2d at 872-73 (internal quotation marks omitted) (quoting *United States v. Colkley,* 899 F.2d 297, 301 (4th Cir. 1990)). In other words, even if the omission here had been material, that fact alone would not prove that it was also reckless. And Rickman provides no evidence of Latimer's "actual deliberation" nor "obvious reasons to doubt" her intent. *Chenoweth*, 160 Wn.2d at 479.

Finally, Rickman argues that a later corrected retranscription of a 911 call cannot be used to support a trial court's earlier decision based on an incorrect or misleading transcript. But Rickman offers no legal authority for this proposition. We therefore hold that the trial court did not abuse its discretion when it declined to hold a *Franks* hearing.[3]

## II. ADMISSIBILITY OF LOCATION DATA

Rickman next argues that the trial court erred when it admitted his smartphone location data under the independent source doctrine despite the failure of the initial warrant application to seek location data and the lack of authorization in the original warrant. To that end, Rickman challenges two of the trial court's conclusions of law: that "the cell phone data collected from the defendant's phone is admissible at trial because it was obtained from an independent source," CP

---

[3] Additionally, the trial court effectively made a *Franks* finding when it ruled that even if the contents of the 911 transcript were removed from the affidavit, there was ample evidence provided to the magistrate to justify a probable cause finding. We agree with the trial court. As explained above, the affidavit included unchallenged information about law enforcement's previous contacts with Choi and Rickman related to Rickman's ongoing harassment of Choi; information about surveillance footage showing Rickman following Choi on the day of the murder and stalking her in the days leading up to it; Rickman's threatening comments about Choi to Angell; and Rickman's confession to Dyches after the murder.

at 543 (Challenged CL 3), and that "the issuance of the warrant on November 29, 2023, was based on untainted, independently obtained information, and the State's decision to seek the warrant was not motivated by the previous unlawful search and seizure," CP at 543 (Challenged CL 4). Rickman also challenges the trial court's finding of fact that the second search warrant affidavit "did not contain any additional information that was obtained as a result of the previously authorized search of the defendant's phone" and that "[t]he only additional information that [was] included in the affidavit relate[d] to law enforcement general knowledge and training regarding data located on cell phones." CP at 542 (Challenged FF 5).

The State concedes that the initial seizure of Rickman's smartphone location data was unauthorized but contends that the trial court's decision not to suppress it was proper because the second warrant constituted an independent source for the evidence. We agree with the State.

A.     Independent Source Doctrine

"We review conclusions of law relating to the suppression of evidence de novo." *State v. Betancourth*, 190 Wn.2d 357, 363, 413 P.3d 566 (2018).

"With very few exceptions," article I, section 7 of the Washington Constitution requires courts to suppress evidence obtained from an illegal search and seizure. *State v. Afana*, 169 Wn.2d 169, 180, 233 P.3d 879 (2010). This "exclusionary rule" applies to "the initially seized evidence and any fruit of the poisonous tree." *Betancourth*, 190 Wn.2d at 364. Article I, section 7 is more protective than the Fourth Amendment because it focuses on protecting individual rights rather than on limiting government actions. *Afana*, 169 Wn.2d at 180. Accordingly, "[u]nlike its federal counterpart, Washington's exclusionary rule is 'nearly categorical.'" *Id.* (quoting *State v. Winterstein*, 167 Wn.2d 620, 636, 220 P.3d 1226 (2009)).

The independent source doctrine is among the few "recognized exception[s] to the exclusionary rule" under the Washington Constitution. *Betancourth*, 190 Wn.2d at 359. "Under the independent source doctrine, evidence tainted by unlawful police action is not subject to exclusion 'provided that it ultimately is obtained pursuant to a valid warrant or other lawful means independent of the unlawful action.'" *Id.* at 364-65 (quoting *State v. Gaines*, 154 Wn.2d 711, 718, 116 P.3d 993 (2005)). "To determine whether challenged evidence truly has an independent source, courts ask whether illegally obtained information affected (1) the magistrate's decision to issue the warrant or (2) the decision of the state agents to seek the warrant." *Id.* at 365. The rationale for the independent source doctrine is that the public interest is best served if law enforcement is put in the same "position that they would have been in if no police error or misconduct had occurred," but not a worse position. *Nix v. Williams*, 467 U.S. 431, 443, 104 S. Ct. 2501, 81 L. Ed. 2d 377 (1984).

The federal exclusionary rule has a "good faith" exception that applies when law enforcement conducted an illegal search or seizure but had an objectively reasonable basis to do so at the time. *United States v. Leon*, 468 U.S. 897, 919-920, 104 S. Ct. 3405, 82 L. Ed. 2d 677 (1984). But under article I, section 7, we are concerned only with whether a search was conducted under the "authority of law." WASH. CONST. art. I, § 7; *see also Betancourth*, 190 Wn.2d at 367. The Washington Supreme Court has therefore held that it is irrelevant whether an officer's good faith belief supported a search warrant application. *Betancourth,* 190 Wn.2d at 367.

In *Betancourth*, law enforcement obtained a warrant from the district court to search the defendant's phone records as provided by the defendant's cellular carrier. *Id.* at 360-61. After a subsequent judicial opinion ruled that only the superior court could issue warrants for out-of-state

companies, law enforcement sought and received a new warrant from the superior court using an essentially identical warrant affidavit. *Id.* at 361-62. After the second warrant, the cellular carrier did not actually send over any new files because law enforcement already had them and doing so would therefore have been redundant. *Id.* at 362. The defendant moved to suppress his phone data on the grounds that the first warrant was jurisdictionally invalid, but the trial court denied the motion. *Id.* The *Betancourth* court ruled that it was proper for the trial court to admit the phone data in light of the second warrant, which constituted a valid independent source. *Id.* at 373.

B.      Analysis

First, we ask whether the trial court's decision to issue the second warrant was affected by the illegally obtained evidence—in this case, Rickman's smartphone location data. The application for the second warrant included general information about the ubiquity of smartphone use and the existence of location tracking on smartphones. It also mentioned evidence that Choi had believed Rickman was tracking her and evidence obtained from his cell phone carrier that Rickman had manipulated his phone to disable location tracking. None of these facts or evidence was derived from the location data on Rickman's phone.

Law enforcement knew that Choi had suspected Rickman of following her because of their previous involvement with Choi before the murder. And the affidavit cites the trap and trace and the call detail records from Rickman's phone carrier—both of which were obtained before police applied for the original warrant seeking Rickman's smartphone data—as the sources of information that Rickman had turned his phone off to avoid being traced by location data. Otherwise, all the information in the second warrant affidavit was identical to the information in the first warrant affidavit and thus could not have been affected by what police found in Rickman's

location data. Accordingly, there was substantial evidence to support the trial court's finding of fact that the second warrant affidavit did not include any information "obtained as a result of the previously authorized search of [Rickman's] phone." CP at 542 (Challenged FF 5). In addition, we hold that neither Rickman's smartphone location data nor any information obtained from it influenced the trial court's decision to issue the second warrant.

Second, we ask whether law enforcement was motivated to seek the second warrant because of what they had already discovered by illegally exceeding the scope of the first. We acknowledge that this case differs somewhat from *Betancourth*, where law enforcement's only error was to seek a warrant from the wrong court. When new legal guidance illuminated the error, police sent an identical warrant application to the superior court. It is clear from those circumstances that law enforcement always intended to seek the defendant's phone records to the extent indicated in the first, jurisdictionally improper warrant. Here, by contrast, the two warrant applications were not identical: the first application failed to request location data.

That said, Detective Latimer stated that police always intended to obtain Rickman's location data, and there is no evidence in the record that contradicts that statement. In the affidavit accompanying the second warrant application, Latimer wrote that law enforcement "intended to . . . search[] for" the location data "[a]t the time of the writing and submitting of the original warrant." CP at 422 (emphasis omitted). It is true that Washington courts do not recognize a good faith exception to the exclusionary rule and, thus, it is not relevant that law enforcement believed they were authorized to collect Rickman's location data based on the first warrant. Additionally, collecting that data was not "objectively reasonable" because the language of the warrant did not authorize it. *See Leon*, 468 U.S. 897 at 922. But the trial court was entitled to rely on Latimer's

23

sworn statement in the second warrant application to conclude that law enforcement's desire to obtain location data was not prompted by what they discovered in their illegal search, especially in the absence of any evidence to the contrary.

Importantly, the location data seems mostly to have corroborated what law enforcement already knew about Rickman's movements based on surveillance footage, their knowledge that he had rented a silver Chevy and a motel room near Choi's workplace, and other circumstantial evidence—such as Rickman's emails to Choi, the vandalism of Blue's car, the theft of Choi's and Blue's laptops, and Rickman's purchase of private investigative reports about Blue and Choi. In other words, the location data did not provide law enforcement with meaningfully new information. This supports the trial court's conclusion that information gleaned from the improper search of Rickman's phone for his location data did not corrupt the State's successful attempt to obtain a second warrant authorizing the police to obtain that data.

We therefore hold that the second warrant was an independent source for Rickman's location data and it was proper for the trial court to deny Rickman's motion to suppress the data.

III. ADMISSIBILITY OF ESCAPE ATTEMPT EVIDENCE

Finally, Rickman argues that the trial court erred when it admitted evidence of Rickman's tampering with his jail window as evidence of an attempted escape giving rise to an inference of consciousness of guilt under ER 404(b).[4]

---

[4] Relatedly, Rickman challenges the trial court's finding of fact that Rickman "made an attempt to escape from his jail cell" and two of the trial court's conclusions of law: that "the attempted escape creates a reasonable and substantive inference that [Rickman's] attempted escape was a reaction to a consciousness of guilt or deliberate effort to evade prosecution" and that "the probative value of the evidence of [Rickman's] attempted escape from jail outweighs any prejudicial effect when the evidence is used to show the defendant's consciousness of guilt." CP at 536-38 (Challenged FF 5; Challenged CL 6-7).

A.      ER 404(b) and Consciousness of Guilt

"We review trial court decisions on the admissibility of evidence for abuse of discretion." *Dobbs*, 180 Wn.2d at 10. ER 404(b) permits the trial court to admit evidence of a person's past wrongs or acts only if they are not offered to prove a person's character or to show that they were acting "in conformity" with that character. Before admitting evidence of past wrongs, a trial court must "'(1) find by a preponderance of the evidence that the misconduct occurred, (2) identify the [permissible] purpose for which the evidence is sought to be introduced, (3) determine whether the evidence is relevant to prove an element of the crime charged, and (4) weigh the probative value against the prejudicial effect.'" *State v. Arredondo*, 188 Wn.2d 244, 257, 394 P.3d 348 (2017) (alteration in original) (quoting *State v. Gresham*, 173 Wn.2d 405, 421, 269 P.3d 207 (2012)).

Evidence that reveals consciousness of guilt is relevant, *State v. Moran*, 119 Wn. App. 197, 218, 81 P.3d 122 (2003), and consciousness of guilt is a permissible purpose to introduce evidence under ER 404(b), *State v. DeJesus*, 7 Wn. App. 2d 849, 877, 436 P.3d 834 (2019). Evidence of flight "is admissible as evidence of consciousness of guilt in [some] cases" such as where "the defendant flees the scene of the crime, escapes police contact, travels to a different state, or evades arrest for a significant period of time." *State v. Slater*, 197 Wn.2d 660, 669-70, 486 P.3d 873 (2021). "While the manner or mode of flight may include a range of circumstances, 'the circumstance or inference of flight must be substantial and real" and not "'speculative, conjectural, or fanciful.'" *Id.* at 668 (emphasis omitted) (quoting *State v. Bruton*, 66 Wn.2d 111, 112, 401 P.2d 340 (1965)).

A trial court may exclude relevant evidence if the danger of unfair prejudice substantially outweighs its probative value. ER 403. The party seeking to exclude evidence bears the burden of showing such prejudice, as evidence is presumed admissible under ER 403. *Carson v. Fine*, 123 Wn.2d 206, 225, 867 P.2d 610 (1994). However, "'[i]n doubtful cases the scale should be tipped in favor of the defendant and exclusion of the evidence.'" *State v. Powell*, 126 Wn.2d 244, 264, 893 P.2d 615 (1995) (internal quotation marks omitted) (quoting *State v. Smith*, 106 Wn.2d 772, 776, 725 P.2d 951 (1986)). "When flight evidence is admissible to show an inference of consciousness of guilt, 'it tends to be only marginally probative as to the ultimate issue of guilt or innocence.'" *Slater*, 197 Wn.2d at 668 (quoting *State v. Freeburg*, 105 Wn. App. 492, 498, 20 P.3d 984 (2001)). "When evidence is likely to stimulate an emotional response rather than a rational decision, a danger of unfair prejudice exists." *Powell*, 126 Wn.2d at 264.

B.    Analysis

It is well established that showing consciousness of guilt is a permissible purpose for admitting evidence under ER 404(b) and that such evidence is relevant. *See DeJesus*, 7 Wn. App. 2d at 877 (permissible purpose); *see also Moran*, 119 Wn. App. at 218 (relevance). And an attempted escape from jail is like the kinds of flight evidence—such as fleeing from the scene of a crime or escaping police contact—that the *Slater* court indicated were concrete enough to give rise to an inference of consciousness of guilt. *See* 197 Wn.2d at 669-70. Therefore, the primary question here is whether it was reasonable for the trial court to find, by a preponderance of evidence, that Rickman engaged in misconduct—that is, whether his tampering with the window occurred and was done for the purpose of escaping jail.

First, the trial court was entitled to rely on Wasson's testimony at the CrR 3.5 hearing to conclude that Rickman tampered with the window. Wasson reported that when he entered Rickman's cell, Rickman said, "'[O]h, [s\*\*t]'" and "'it's under my bed,'" and that Wasson found missing parts of the cell window under Rickman's mattress. 2 VRP at 130. Additionally, the idea that Rickman was trying to escape was not "speculative, conjectural, or fanciful." *Slater*, 197 Wn.2d at 668 (quoting *Bruton*, 66 Wn.2d at 112). Wasson told the trial court that Rickman had begun taking apart the window, and that another person incarcerated at the jail told staff that Rickman was attempting escape.

Rickman points to aspects of Wasson's later testimony at trial that Rickman believes cast doubt on the notion that he was attempting to escape. But our focus is solely on the information available to the trial court when it ruled on the admissibility of the flight evidence pretrial. And based on Wasson's testimony at the 3.5 hearing, it was within the trial court's discretion to conclude that Rickman was trying to escape.[5] Rickman raised no further objection after hearing Wasson's testimony at trial.

Finally, we must evaluate whether the trial court properly determined that the prejudicial effect of this evidence did not substantially outweigh its probative value. We acknowledge that flight evidence introduced to show consciousness of guilt is only "'marginally probative.'" *Slater*, 197 Wn.2d at 668 (quoting *Freeburg*, 105 Wn. App. at 498). But the ER 403 standard presumes

---

[5] The report of proceedings for this hearing indicates that the trial court admitted Wasson's written report of the incident as an exhibit. But that exhibit is not in the appellate record. To the extent that it contained information that may have been helpful to Rickman's argument on appeal, it was Rickman's responsibility to include it in our record. *See State v. Sisouvanh*, 175 Wn.2d 607, 619, 290 P.3d 942 (2012) (we are entitled to affirm the trial court when "the incomplete record before us is sufficient to support the decision, or at least fails to affirmatively establish an abuse of discretion." (internal citations omitted)).

27

relevant evidence should be admitted, and Rickman does not explain why this evidence would prejudice a jury so much that it would *substantially* outweigh that marginal probative value. The testimony that Rickman tried to escape through the jail window was not particularly upsetting or gruesome and was unlikely "to stimulate an emotional response rather than a rational decision." *Powell*, 126 Wn.2d at 264. Absent some other compelling reason to believe this evidence was unfairly prejudicial, we hold that the trial court did not abuse its discretion when it denied Rickman's motions to suppress.

Additionally, even if it was error for the trial court to admit this evidence, the error was harmless. Under the nonconstitutional harmless error standard, we do not reverse a trial court's erroneous admission of evidence unless there is a reasonable probability that the error materially affected the outcome of trial. *Gresham*, 173 Wn.2d at 433. Here there was significant, compelling evidence against Rickman unrelated to the alleged escape attempt. That evidence included extensive surveillance footage showing Rickman following Choi on the day of the murder and stalking her in the days leading up to it; testimony about Rickman's threatening comments about Choi to acquaintances and his confession to Dyches after the murder; Rickman's drafted text to Choi stating he would "[s]ee [her] soon"; the recording of the 911 call in which Choi said her boyfriend was following her; and the location data from Rickman's phone. Ex. 405.

CONCLUSION

We affirm Rickman's conviction.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

GLASGOW, J.

We concur:

P RICE, A.C.J.

CRUSER, J.